UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**NIGHT BOX
FILED**

JUN 0 1 1998

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

———————————————————————

IN RE PHYSICIAN CORPORATION OF
AMERICA SECURITIES LITIGATION

———————————————————————

)
)
)
)
)
)

MASTER FILE NO. 97-3678-CIV

MIDDLEBROOKS

JURY TRIAL DEMANDED

## CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, for their complaint, allege on information and belief, the following:

### SUMMARY OF THE ACTION

1.      Plaintiffs bring this action as a class action, on behalf of a class of purchasers of the common stock of Physician Corporation of America, Inc. ("PCA" or the "Company"), to recover damages arising from defendants' violations of the federal securities laws. This class action is brought on behalf of a class of all purchasers of PCA common stock during the period beginning March 31, 1996 through and including March 31, 1997, except those persons as set forth in ¶16 hereof (the "Class Period").

2.      Plaintiffs' allegations are based upon the investigation of their counsel, which included, among other things, a review of PCA's filings with the Securities and Exchange Commission ("SEC"), securities analyst reports, press releases, documents obtained from the Florida Department of Insurance ("DOI"), the complaints filed in (i) Physician Corporation v. Sierra Health Services, Inc., Case No 97-0671 CIV-HIGHSMITH, Southern District of Florida Miami Division ("PCA v. Sierra") and (ii) Sierra Health Services, Inc., et al. v. Physician Corporation of America (Court of Chancery of the State of Delaware, New Castle County, C.A. No. 15629NC) ("Sierra v. PCA"); and PCA Property & Casualty Insurance Company's Response to Order to Show Cause in State of Florida v.



PCA Property & Casualty Insurance Company, Case No. 97-997 (Cir. Ct. of Second Judicial Circuit, Leon Cty. Fla.) (filed on April 2, 1997) ("State of Fla. v. PCA P&C").

3.     Defendant PCA, until its acquisition by Humana, Inc. on September 8, 1997, was a managed health care company which also provided worker's compensation coverage to a variety of employer groups.  PCA was the largest Medicaid Health Maintenance Organization ("HMO") provider in Florida with approximately 172,000 Medicaid beneficiaries, or approximately 46% of Florida's total HMO-enrolled Medicaid beneficiaries. PCA's wholly owned subsidiary, PCA Solutions, participated in the worker's compensation market by providing third party administrative ("TPA") services to self-insured employee worker's compensation funds.  PCA also participated in this market by directly underwriting worker's compensation policies and by offering excess of loss reinsurance coverage.  Worker's compensation polices were underwritten by PCA through its PCA Property and Casualty Insurance Company, Inc. ("PCA P&C") subsidiary.  Regulatory changes decreasing PCA's reimbursement rate for medicare services by 18% (effective July 1, 1995) made the expansion of PCA's worker's compensation business critical to the continued success and growth of the Company.

4.     The State of Florida imposes minimum financial requirements on property and casualty insurers governing the worker's compensation policies administered and underwritten by PCA. The failure of an insurer to meet statutorily proscribed minimum reserve funding requirements "constitutes an immediate serious danger to the public health, safety, or welfare."  Fla. Stat. § 624.418(3) (1996).  The DOI may revoke or suspend the certificate of authority of a statutorily impaired or insolvent insurer.  Alternatively, the DOI may take control of an insurer by initiating a rehabilitation proceeding.

5.     By March 31, 1996, defendants knew or recklessly disregarded that the worker's compensation business of FBE, a self-insured fund, for which PCA P&C was financially responsible, was materially underreserved. PCA privately acknowledged a portion of the shortfall in confidential negotiations with a potential merger partner, Sierra Health Services, Inc. ("Sierra"), as well as in communications with the DOI and a sworn affidavit submitted to the DOI. However, instead of publicly disclosing this material fact to investors, PCA issued public statements, including financial statements, throughout the Class Period, which misrepresented the financial condition of PCA's worker's compensation business, failed to correct prior statements disseminated to the public, touted the success of PCA Solutions' TPA business while failing to disclose the serious problems in PCA P&C's worker's compensation insurance business and falsely indicated that PCA was in the process of a turnaround and poised for a merger. PCA's worker's compensation businesses were falsely portrayed as "profitable" with "strong internal growth and continued earnings performance." The defendants also falsely represented that the conversion of self-insured funds' business, including FBE, into policies written directly by PCA P&C was having a positive impact on PCA's bottom line by "boosting revenues" to record levels when, in truth, the assumption of financial responsibility for the past writings of the self-insured funds served to escalate the liabilities of PCA P&C because the self insured funds were materially underreserved when PCA P&C acquired them. Moreover, during the Class Period, PCA announced that it had reached a definitive merger agreement with Sierra on terms that were exceptionally favorable to PCA. However, defendants knew or recklessly disregarded that it was unlikely that the merger would ever be consummated when Sierra became aware of the true condition of PCA's worker's compensation business. Sierra terminated the merger agreement when in fact it became aware of the true magnitude of PCA's worker's compensation

liabilities.  Contrary to the positive statements of the defendants, PCA's worker's compensation business suffered a $284.4 million loss for fiscal 1996, including a $38.9 million impairment of assets and write-down of goodwill associated with PCA's TPA services.

6.      As a result of defendants' materially false and misleading statements, the price of PCA common stock was artificially inflated during the Class Period. Indeed, at least three analysts issued "buy" ratings on PCA common stock during the Class Period based on defendants' materially false and misleading statements.

7.      At the close of the Class Period, the DOI was granted an order from the Circuit Court of the Second Judicial Circuit, Leon County, Florida, compelling PCA to show cause as to why PCA P&C should not be placed in rehabilitation to be operated by the DOI. As a result, PCA was forced to disclose the true financial condition of its worker's compensation business. On March 31, 1997, the last day of the Class Period, when the full financial results for fiscal 1996 were finally disclosed, the price of PCA common stock, which had traded as high as $15.375 per share during the Class Period, closed at $4.625.

### JURISDICTION AND VENUE

8.      Jurisdiction and venue of this Court are founded on Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, Sections 1331 and 1337 of Title 28, 28 U.S.C. § 1331, 1337 and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

9.      The claims herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (the "SEC").

10. Acts and conduct charged herein, including the dissemination of materially false and misleading reports and the issuance of materially false and misleading information to the investing public, occurred in this District. In addition, PCA's executive offices were, at all times material to the allegations herein, located in this District.

11. In connection with the acts and course of conduct alleged in this Complaint, the defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications, and the facilities of the national securities markets.

### THE PARTIES

#### Plaintiffs

12. (a) Plaintiff Stewart Colton purchased 223 shares of common stock of PCA on November 4, 1996 at $10.75 per share.

(b) Plaintiff Janice Wells purchased 200 shares of common stock of PCA on June 4, 1996 at $14-3/8 per share.

(c) Plaintiff Medhat Reiser purchased 500 shares of common stock of PCA on November 4, 1996 at $11.00 per share and 500 shares on November 29, 1996 at $10-3/8 per share.

(d) Plaintiff David Applestein purchased 1,000 shares of common stock of PCA on June 12, 1996 at $14.44 per share.

(e) Plaintiff Alton Morgan, Jr. purchased 300 shares of common stock of PCA on June 4, 1996 at $14.50 per share and 200 shares on January 16, 1997 at $9.25 per share.

## Defendants

13.  (a)  PCA was incorporated in the state of Delaware and provided health care services through its health maintenance organizations ("HMOs"), administrative and management services through its workers compensation third-party administration companies ("TPAs") and workers compensation and health related insurance through its insurance companies. PCA was merged into Humana, Inc. on September 8, 1997.

(b)  PCA provided comprehensive health care services through its HMO's in Florida, Texas and Puerto Rico. The Company's 1,012,000 Health Plan members included commercial groups and individuals, as well as beneficiaries of government programs. PCA provided comprehensive health care services through its health maintenance organizations, administrative and management services through its worker's compensation TPA companies, and worker's compensation and health related insurance through its insurance companies, including PCA P&C. PCA was listed on the Nasdaq National Market System under the ticker symbol "PCAM."

(c)  PCA was founded in 1985. The Company completed its initial public offering in 1993. In 1994, PCA diversified its product line by entering the worker's compensation market.

(d)  PCA entered the worker's compensation market by providing TPA services to self-insured worker's compensation funds through its subsidiary PCA Solutions and also by offering excess of loss reinsurance coverage in the worker's compensation market. Self-funded worker's compensation plans allow employers to create a fund to pay for health care claims. However, employers who participate in self-insured funds may be directly assessed for liabilities which exceed the capital available in such a fund to pay claims. The administration services provided

-6-

by PCA to self-insured worker's compensation funds included claims processing, health care management services, and access to PCA's provider network. In exchange for its administrative services, PCA Solutions received a fee ranging from 8% to 15% of earned normal premiums paid by the funds.

(e)     PCA also provided direct worker's compensation coverage through PCA P&C. PCA P&C primarily wrote worker's compensation policies for those employers insured through funds previously administered by PCA Solutions.

14.     The following individuals are collectively referred to as the "Individual Defendants."

(a)     Defendant E. Stanley Kardatzke ("Kardatzke") was at all times relevant hereto, Chairman of the Board of Directors and Chief Executive Officer of PCA. At the start of the Class Period, Kardatzke held over 3.4 million shares of PCA common stock or more than 7% of all outstanding shares. Defendant Kardatzke signed, personally or by attorney-in-fact, PCA's SEC Form 10-K for the year ended December 31, 1995 and PCA's Forms 10-Q for the first, second and third quarters ended March 31, 1996, June 30, 1996 and September 30, 1996, respectively.

(b)     Defendant Peter E. Kilissanly ("Kilissanly") was, at all times relevant hereto, President, Chief Operating Officer, and a director of PCA, President and Chief Executive Officer of PCA/Florida as well as President of PCA Solutions. Defendant Kilissanly signed, personally or by attorney-in-fact, PCA's SEC Form 10-K for the year ended December 31, 1995.

(c)     Defendant Clifford W. Donnelly ("Donnelly") was, at all times relevant hereto, Senior Vice President of Finance and Chief Financial Officer of PCA. Defendant Donnelly signed, personally or by attorney-in-fact, PCA's SEC Form 10-K for the year ended December 31,

1995 and PCA's Forms 10-Q for the first, second and third quarters ended March 31, 1996, June 30,1996 and September 30, 1996, respectively.

(d) Defendant Jay M. Grobowsky was, at all times relevant, PCA's Vice President of Finance. Defendant Grobowsky signed, personally or by attorney-in-fact, PCA's SEC Form 10-K for the year ended December 31, 1995 and PCA's Forms 10-Q for the first, second and third quarters ended March 31, 1996, June 30, 1996 and September 30, 1996, respectively.

15. Each of the Individual Defendants is liable as a direct participant in the wrongs complained of herein. Additionally, because of their positions of control and authority as officers and directors, the Individual Defendants were able to and did control the contents of the Company's public filings, and the various financial reports, press releases and public statements of PCA, in regard to which their conduct was knowing or reckless. As officers and directors of a publicly held company, the Individual Defendants had a duty to both disseminate promptly accurate and truthful information with respect to PCA's operations, prospects and financial status and correct information which had become false, misleading and deceptive.

## PLAINTIFFS' CLASS ALLEGATIONS

16. The named Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("FRCP") on behalf of a class (the "Class") consisting of all persons who purchased the common stock of PCA during the period beginning on March 31, 1996 through and including March 31, 1997 (the "Class Period"), with the exception of defendants, their officers and directors, the subsidiaries, affiliates and entities they control and officers and directors of such subsidiaries, affiliates and entities, and members of the immediate families of the Individual Defendants.

17.     Members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. According to the Company, as of June 30, 1996, 38,779,420 shares of PCA common stock were outstanding.

18.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19.     Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs and all members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

20.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to individually redress the wrongs done to them.

21.     There are questions of law and fact common to this Class which predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to this Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether defendants participated in and pursued the common course of conduct complained of;

(c)     whether the documents disseminated to the investing public and other public statements made by the defendants during the Class Period omitted and/or misrepresented

material facts about the Company's earnings, financial statements, business affairs, financial condition of and prospects of the Company;

(d)     whether defendants knowingly or recklessly failed to correct prior statements relating to such earnings, financial statements, business affairs, financial condition and prospects for when such statements had become false, misleading and deceptive;

(e)     whether the defendants acted knowingly or recklessly in omitting to state and/or misrepresenting material facts;

(f)     whether the market price of PCA common stock during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages, and, if so, what the proper measure of damages is.

22.     Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a Class Action.

## FACTUAL ALLEGATIONS

23.     In August 1994, PCA acquired Association Employers Insurance Company, a Florida property and casualty insurer, as part of PCA's acquisition of Executive Risk Consultants, a third-party administrator of worker's compensation self-insurance funds.  Association Employers Insurance Company changed its name to PCA Property and Casualty Insurance Company ("PCA P&C") in early 1995.

24.     PCA Solutions, Inc., a subsidiary of PCA, provided TPA services to several Florida self-insurance funds.  One of those funds was the Florida Home Builders Self-Insurance Fund

-10-

which later became known as the Florida Builders and Employers Mutual Insurance Company ("FBE").

25.     Major changes in the worker's compensation market in Florida occurred in 1994 and such changes brought national insurance carriers back to Florida. This made it possible for employers to obtain worker's compensation insurance coverage directly through insurance carriers, rather than through self-insured funds in which they would be subject to assessments if the claims made exceeded the surplus available to pay such claims. The pending assessments of two self-insurance funds in 1994 also caused significant numbers of policyholders to seek coverage through a non-assessable entity.

26.     Under these circumstances, PCA Solutions knew that it would, in all likelihood, lose all or most of the TPA business of the self-insured assessable funds because policyholders would prefer to have insurance coverage rather than be subject to assessments as members of self-insured funds. In order to preserve its revenue stream from the TPA services which it had provided to self-insured assessable funds and, faced with decreasing Medicaid revenues in Florida which negatively impacted PCA's HMO business, PCA decided to have PCA P&C, an existing insurance company, offer worker's compensation insurance coverage to the self-insured assessable funds. However, PCA P&C was competing with other worker's compensation insurance carriers to obtain the insurance business of policyholders who had previously participated in self-insured assessable funds and had to offer such policyholders an incentive to choose PCA P&C over its competitors. The incentive which defendants arrived at was an offer to assume the assets and liabilities of the self-insured assessable funds in exchange for the employers purchasing worker's compensation insurance from PCA P&C.

27.     Therefore, in July 1995, PCA, through its subsidiary PCA Solutions, retained Paragon Reinsurance Risk Management Services, Inc. ("Paragon") to determine the capital needed to support worker's compensation insurance policies written by two Florida self-insured funds, Florida Business Mutual ("FBM") and FBE, for which PCA Solutions had been providing TPA services and which PCA P&C now intended to acquire.  PCA Solutions provided Paragon with all of the working assumptions for writing the business previously underwritten by FBM and FBE. In the report dated July 17, 1995, Paragon concluded that $55 million of additional capital would be required to support the future business that would be written for the employers previously insured by these funds. The $55 million of additional capital did not address any capital requirements for the business previously written by the funds that had been administered by PCA Solutions or the amounts required to pay claims on business written prior to the date of the Paragon report.

28.     On October 10, 1995, PCA P&C's regulatory liaison Sandy Lazier-Harley met with Wayne Johnson and Tom Waring of the DOI in Tallahassee to discuss ceasing operations of FBE and FBM and continuing coverage for the policy holders through PCA P&C. PCA P&C offered to renew all FBE & FBM policies that would expire December 31, 1995, and all policies expiring after January 1996 would be assumed by PCA P&C.  PCA P&C also requested that the agents appointed through FBE be renewed as PCA P&C agents at such time as their appointment expired. With regard to liabilities of FBE, PCA P&C proposed to issue an aggregate stop loss reinsurance policy for all outstanding liabilities of FBE.

29.     PCA P&C agreed to issue the aggregate stop loss insurance policy to FBE reinsuring 100% of the liabilities of that entity in excess of its assets and future investment earnings as a condition of receiving DOI approval for the assumption of FBE's insurance business.  The stop

loss reinsurance policy was also required to obtain DOI agreement that the members of the self-insured funds would not be assessed for any deficiency in the funding of past losses.

30.     The negotiations with the DOI ultimately led to the entry of Consent Order, No. 12711-95-C-RAP on November 14, 1995 between PCA P&C, PCA and the DOI ("1995 Consent Order") whereby:

(a)     PCA agreed to make a $60 million capital infusion to PCA P&C on or before December 31, 1995 to enable FBE and FBM to operate prospectively, but not to pay out past claims;

(b)     PCA agreed to obtain prior to January 1, 1996, a 50% quota share reinsurance treaty for all primary worker's compensation coverage written on or after October 1, 1995 through December 31, 1996;

(c)     PCA P&C agreed to renew all policies of FBE which expired on December 31, 1995 effective January 1, 1996. Policies with expiration dates after January 1, 1996 would be assumed by PCA P&C effective January 1, 1996;

(d)     PCA P&C agreed to appoint all agents presently appointed with FBE at the time their appointment expired;

(e)     PCA agreed to provide through PCA P&C an aggregate stop loss reinsurance policy to FBE effective January 1, 1996 that would attach when all assets of FBE had been liquidated. "[A]ny and all remaining losses and loss adjustment expenses shall be the responsibility of [PCA P&C]." (Emphasis added)

31.     At the time the Consent Order was entered into in November 1995, the annual statutory audited financial statements for FBE for the year ended December 31, 1994 and the interim quarterly statements showed an $8.9 million surplus. However, defendants knew or were reckless

-13-

in not knowing that this purported surplus was inadequate because, if, based upon the assumptions in the Paragon Report, FBE wrote approximately $150 million of worker's compensation premiums in 1994, that level of writings for an insurance company, without reinsurance, would require at least $50 million of surplus. Even with 50% quota share reinsurance, which was the "most likely" scenario according to the assumptions which PCA P&C gave to Paragon, an insurance company at year end 1994 would have needed at least $25 million in surplus. The benchmark in the insurance industry for the ratio of net written premiums to surplus is 3 to 1. Insurance regulators will scrutinize carefully any ratios greater than 3 to 1 and may require additions to surplus in order to support the amount of business being written. PCA P&C was well aware of this benchmark because it was writing various types of insurance in 1995. On the business which it wrote, prior to the acquisition of FBE and FBM, PCA P&C maintained a ratio of net written premium to surplus of 1.67 to 1 as of December 31, 1994. If the premiums written by FBE in 1994 were approximately $150 million, the surplus of $8.9 million was inconsistent with PCA P&C's own business practices because the ratio of net premiums to surplus would have been 16.9 to 1. Even if a 50% quota reinsurance treaty had been in place, the ratio still would have been 8.45 to 1, well above PCA P&C's ratio of 1.67 to 1. Therefore, assuming premiums written of $150 million, PCA P&C knew or recklessly disregarded that the reported surplus of $8.9 million was likely to be inadequate for the amount of business that had been written. In assuming the liabilities of FBE pursuant to the November 1995 Consent Order, PCA P&C could take no comfort from the reported $8.9 million surplus because it knew or recklessly disregarded any adverse loss development would eliminate FBE's surplus and PCA P&C would be responsible for funding any surplus deficiency.

32.     Accordingly, the defendants knew or were reckless in not recognizing at the time that the 1995 Consent Order was signed that the $60 million infusion of capital by PCA into PCA P&C was inadequate because it would only apply to the "going forward" operation of the self-insured funds and would not be sufficient to cover claims on business written in the past.  Although defendants knew or recklessly disregarded that FBE's surplus was likely to be insufficient, PCA nevertheless decided to assume its liabilities so that PCA P&C could offer insurance coverage to policyholders who had previously participated in FBE and to maintain a revenue stream that it would otherwise have lost.  Defendants expected to mask the significant liabilities of FBE of which they were well aware or because, although PCA P&C assumed FBE's liabilities, pursuant to the 1995 Consent Order, PCA P&C did not report FBE's financial condition on its financial statements filed with the DOI.

33.     Despite defendants' knowledge that PCA P&C had assumed the liabilities of FBE, which had inadequate statutory surplus, defendants repeatedly represented that the Company's diversification into worker's compensation was proceeding successfully.  On November 30, 1995, PCA issued a press release concerning the 1995 Consent Order with the DOI.  In the press release, PCA announced that it had been granted approval by DOI to convert (effective January 1, 1996) $300 million in gross written annual premiums from the assessable/self-insured funds, to a nonassessable policy insured by P&C.  PCA's press release represented that "PCA P&C will be responsible for satisfying existing policy claims" and that FBE and FBM were structured to provide "superior financial security for the policyholders."

-15-

34.     Defendant Kardatzke was quoted in PCA's November 30, 1995 press release as stating that the "initial conversion is not expected to impact earnings."  Moreover, PCA's November 30, 1995 press release represented that PCA P&C had a surplus in capital:

> P&C has received a capital commitment from its parent company, Physician Corporation of America (Nasdaq: PCAM) (PCA), for $60 million, which will bring PCA P&C's surplus and capital to more than $91 million.  PCA P&C's reinsurance partners provide an additional $6.1 billion policyholder surplus, resulting in superior financial security for the policyholders.  [Emphasis added].

35.     The November 30, 1995 press release failed to disclose that PCA's $60 million capital commitment to PCA P&C was only to cover claims on future business written by the self-insured funds, not any deficiency in the funding of claims from past business.  Further, defendants knew or were reckless in not recognizing that FBE's statutory surplus of $8.9 million was inadequate at the time of PCA P&C's assumption of its liabilities.  Since the $60 million could not be used for past writings, defendants knew or were reckless in not recognizing that PCA P&C was undercapital-ized to cover claims on business written prior to its assumption of the liabilities of FBE and FBM. Under these circumstances, PCA's representation there was "superior financial security for the policyholders" was patently false.  Defendant Kardatzke's statement that the "initial conversion is not expected to impact earnings" was also materially misleading because although PCA P&C did not report the financial results for FBE and FBM to the DOI, PCA P&C did assume their liabilities. Therefore, PCA P&C's earnings would be affected by the acquisition of FBE and FBM, both of which had deficient statutory surplus.

36.     PCA's February 20, 1996 press release, which announced results for fiscal 1995, once again focused investor attention on the purported success of PCA's diversification into

worker's compensation insurance. As expected, earnings were negatively impacted by the decrease in Florida Medicaid revenues. PCA incurred a net loss of $24.6 million for the year ended December 31, 1995 (as compared to net earnings of $52.5 million for the year ended December 31, 1994). Defendant Kardatzke personally remarked that PCA Solutions, the lynch pin of PCA's turnaround strategy, had enjoyed an "exceptionally good year." Kardatzke also stated:

> PCA Solutions, our worker's compensation company, enjoyed an exceptionally good year and has proven to be an excellent diversification strategy. The worker's compensation products, offered through PCA Solutions, produced pretax earnings of approximately $24.2 million in 1995. PCA Solutions is now operating in 14 southeastern states. We look forward to continued success with our worker's compensation products, especially as we roll out our 24-hour product combining our worker's compensation product with our HMO products as a cost effective package for employers. [Emphasis added].

37.     The statement that PCA's worker's compensation business was an "excellent diversification strategy" was materially false and misleading because (1) PCA P&C had assumed the liabilities of FBE, which had deficient statutory surplus; and (2) the $60 million capital commitment to PCA P&C which PCA made pursuant to the 1995 Consent Order was inadequate to operate the worker's compensation business prospectively as well as to pay any deficiency in the funding of claims on business written in the past.

38.     At the beginning of the Class Period, in late March 1996, FBE's audited financial statements for the fiscal year ending December 31, 1995 were made available to PCA P&C management. (See PCA v. Sierra Compl. ¶17) These audited financial statements showed a $51.1 million deficit for FBE as of the year ended December 31, 1995. The audited statements revealed facts of which defendants had been aware or were reckless in not knowing prior to entering into the

-17-

1995 Consent Order — *i.e.*, that a substantial portion of this deficit resulted from adverse loss development for years before 1995, thus indicating that FBE had been substantially underreserved prior to December 31, 1995. In addition, PCA P&C should have realized that the pricing assumptions used to establish rates for policies issued after December 31, 1995 were inadequate resulting in likely future losses.

39.     Pursuant to Generally Accepted Accounting Principles ("GAAP"), upon learning of FBE's $51.1 million deficit, defendants were required to record the $51.1 million liability which arose pursuant to PCA P&C's reinsurance obligations of FBE and take a charge against earnings, but did not do so. Statement 5 of the Financial Accounting Standard Board ("FASB 5") provides that an estimated loss from a loss contingency shall be accrued by a charge to income if the loss is probable and the amount of the loss can be reasonably estimated.

40.     SEC Exchange Act Industry Guide 4 and Securities Act Industry Guide 6 apply to the description of business portion of property-casualty insurance underwriter registration statements, proxy statements and annual reports to the SEC on Form 10-K. The information called for by the guides provides investors with information about certain significant transactions during the periods being reported on, a company's reserving practices and any difference between reserves reflected in reports to state regulatory authorities and those appearing in financial statements in accordance with GAAP. The guides apply to the description of business, but allow for presentation of the information in Management's Discussion and Analysis ("MD&A"), if in management's opinion such presentation would be more meaningful to investors. The indication by the guides that an item should be considered for discussion in the description of business does not change management's responsibilities under the MD&A requirements of Regulation S-K Item 303.

-18-

41.    In Exchange Guide 4, which applies to reports filed on Form 10-K, the SEC Division of Corporation Finance Manual provides guidance on the application of Exchange Act Industry Guide 4 which applies to Property Casualty Reinsurance Disclosure.  For example, that guide calls for tabular information depicting the activity with respect to loss reserve estimates and revisions to those estimates over time.  The Guide also calls for a discussion of reinsurance transactions that have a material effect on earnings or reserves.  The SEC staff also expects that material historical and expected effects of trends and uncertainties in loss reserves and reinsurance recoverables on the company's results of operations, liquidity and capital resources should be disclosed in the MD&A.  The SEC requires the following to be among the matters discussed in the description of business: (1) the nature of current year adjustments to loss reserves recorded in prior years; (2) reinsurance transactions which have a material effect on earnings or reserves; (3) significant reserving assumptions and recent changes therein; (4) the nature of recent changes in the terms under which reinsurance is ceded to other insurers; (5) changes in the mix of business; (6) changes in payment patterns due to portfolio loss transfers, structured settlements and other transactions and circumstances; and (7) unusually large losses or gains.  The company should include an explanation of the data which will disclose the effects of unusual circumstances, for example changes in reinsurance agreements, which might distort the data. Further, the company should state the amount of the difference, if any, between GAAP basic property/casualty reserves for claims and claims adjustment expenses and statutory property/casualty reserves for claims and claims adjustment expenses and explain briefly the nature and amount of principal difference. Further, in SAB No. 87, Topic 5-W (12/12/89), the SEC staff expressed its view regarding contingency disclosures on property-casualty insurance reserves for unpaid claim costs, as follows:

-19-

The staff believes that specific uncertainties (conditions, situations and/or sets of circumstances) not considered to be normal and recurring because of their significance and/or nature can result in loss contingencies [the potential for a material understatement of reserves for unpaid claims] for purposes of applying SFAS 5 disclosure requirements ... some specific uncertainties that may result in loss contingencies pursuant to SFASF, depending on significance and/or nature, include insufficiently understood trends in claims activity, judgmental adjustments to historical experience for purposes of estimating future claim costs ...; significant risks to an individual claim or group of related claims; or catastrophic losses.

\* \* \*

It should also be disclosed that there is a reasonable possibility that the claims experience could be the indication of an unfavorable trend which would require additional IBNR claim reserves in the approximate range of $XX - $XX million (alternatively, if Company management is unable to estimate the possible loss or range of loss, a statement to that effect should be disclosed). Additionally, the staff also expects companies to disclose the nature of the loss contingency and the potential impact on trends in their loss reserve development discussions provided pursuant to Property-Casualty Industry Guides 4 and 6 [see ¶25,003]. Consideration should also be given to the need to provide disclosure in Management's Discussion and Analysis.

42. The Audit and Accounting Guide for Audits of Property and Liability Insurance Companies of the American Institute of Certified Public Accountants (AICPA) provides that accruals for supplemental reserves must conform with FASB Statement No. 5, i.e., determination can be made that a liability has been incurred and the amount of the liability can reasonably be estimated.

43. Item 303 of Regulation S-K promulgated by the SEC under the Exchange Act requires reporting of all trends, demands or uncertainties that are reasonably likely to impact a company's liquidity, net sales, revenue, income and/or previously reported financial information such that it would not be indicative of future operating results.

44.     Therefore, at the time defendants learned of FBE's $51.1 million deficit, for which PCA P&C was financially responsible, PCA was required by the accounting authorities and SEC rules and regulations set forth above (1) to disclose that PCA P&C's reserves were subject to an uncertainty in the amount of $51.1 million; (2) to record both a liability of $51.1 million and a charge against earnings in that amount pursuant to FASB 5; and (3) to disclose the inadequacy of PCA P&C's existing reinsurance for FBE. Defendants took none of these required actions.

45.     Rather, in PCA's Form 10-K for the fiscal year ended December 31, 1995, signed by defendants Kardatzke, Kilissanly, Donnelly and Grobowsky, and filed with the SEC on April 1, 1996, after defendants received FBE's audited financial statements showing a $51.1 million deficit, PCA made none of the disclosures required by, among other authorities, GAAP, FASB No. 5, Exchange Act Industry Guide 4, The AICPA Audit and Accounting Guide for Audits of Property and Liability Insurance Companies or Item 303 of Regulation S-K, nor did PCA record a liability for $51.1 million and take a charge against earnings. PCA's Form 10-K misleadingly stated as follows, without disclosing FBE's substantial deficit of which defendants were aware and for which PCA P&C was responsible:

> The Company's HMO subsidiaries, PCA P&C and PCA/Reinsurance are required to maintain certain levels of regulatory capital for statutory purposes. Consequently, net assets of consolidated subsidiaries amounting to approximately $43,910 and $45,800[1] were not available for transfer to PCA at December 31, 1995 and 1994, respectively.

---

[1]Assets are stated in thousands.

-21-

46.     The Form 10-K also misleadingly stated the following, without disclosing FBE's known $51.1 million deficit or its impact on PCA P&C's statutory surplus or reinsurance obligations:

> In January 1996, PCA P&C commenced writing direct worker's compensation coverage for Florida employer groups who had in prior periods obtained worker's compensation coverage through self-insured funds (the funds). These funds accounted for approximately 52% of the third party administration fees earned by PCA Solutions in 1995. <u>Additionally, PCA P&C and the funds obtained the consent of the Treasurer of the State of Florida Department of Insurance to transfer certain assets and all liabilities of the funds to PCA P&C through a loss portfolio transfer agreement</u>. This transfer will be completed in the first quarter of 1996. (Emphasis added)

47.     FBE's deficit was a cause for serious concern to PCA, due to its reinsurance obligations for this business pursuant to the terms of the 1995 Consent Order. PCA P&C now had an additional liability of $51.1 million. PCA P&C management, well aware of the serious problem it had arising from FBE's $51.1 million deficit, took the initiative to keep the DOI fully informed of such problem and "commencing in April 1996, PCA P&C officials communicated and met with [DOI] representatives many times and made numerous written submissions and proposals to the [DOI]." See <u>State of Florida v. PCA P&C</u> Compl. ¶12. "Also, upon learning of the deficit, PCA P&C immediately began developing a plan to cure the deficit." <u>Id</u>.

48.     Therefore, in May 1996, after learning of the substantial deficit in FBE, PCA, through its subsidiary PCA Solutions, began negotiations to enter into a reinsurance treaty for FBE with Centre Reinsurance Company of New York ("Centre Re"). A similar reinsurance treaty was proposed for FBM. The proposed transaction was financial reinsurance, in which Centre Re would have lent surplus to PCA P&C. This reinsurance was essentially a loan transaction not a risk transfer.

-22-

In a financial reinsurance transaction, the reinsurer will lend surplus to the insurance company in exchange for interest payments on the amount of the loan. A transfer of risk does not occur in such a reinsurance transaction. State regulatory authorities generally will not approve financial reinsurance transactions and typically require a complete risk transfer in order to approve reinsurance contracts.

49.    Defendants knew or were reckless in not knowing (1) that in view of FBE's documented $51.1 million deficit, PCA P&C was unlikely to obtain the necessary risk transfer reinsurance; (2) that the proposed reinsurance transaction with Centre Re was financial reinsurance, which was essentially a loan; and (3) that the DOI would not approve such a transaction.

50.    On May 6, 1996, PCA issued a press release headlined "PCA'S FIRST QUARTER MEMBERSHIP, REVENUES HIT RECORD LEVELS; LOSS NARROWS SIGNIFICANTLY." It proclaimed that results for the first quarter 1996, ended March 30, 1996, reflected "a turnaround in progress in its Florida operations." Revenues for the quarter increased 38% to $378.9 million. Results improved significantly over the fourth quarter 1995 net loss of $36.5 million or $0.92 per share. Net losses for the quarter narrowed to $4.9 million, or $0.13 per share.

51.    The conversion of self-insured funds into policies written directly by PCA P&C purportedly contributed to PCA's record first quarter results by "boosting revenues" and "exceeding management's expectations." The press release stated:

> PCA Solutions, the company's worker's compensation subsidiary, continues to see an increase in revenues and expansion of its product line. The rollover of premiums from TPA business into premium business at PCA P&C exceeded management's expectations, boosting revenues for PCA Solutions and its affiliates 36% to $61.0 million in the first quarter from $44.9 million in the fourth quarter of 1995. The Company's ability to deliver and administer coordinated worker's compensation and employee benefit health plans is expected to provide additional momentum to PCA's overall operations in 1996.

-23-

This wholly owned PCA division now provides worker's compensation coverage to over 70,000 employer groups in 14 southeastern states. [Emphasis added].

52.     Moreover, PCA indicated that its worker's compensation companies were "profitable" with "strong internal growth and continued earnings performance":

> We remain focused on the performance of our four divisions: Florida, Texas, Puerto Rico Health Plans and our Worker's Compensation companies. Three of these are profitable with strong internal growth and continued earnings performance. The Florida HMO operations had pretax losses of $16.1 million in this quarter, versus $22.9 million in the fourth quarter last year, on a membership base of over 360,000 members. The Florida turnaround is progressing and is expected to be completed in 1996 and become a significant contributor to PCA's overall operations for 1997. [Emphasis added].

53.     The foregoing press release was materially false and misleading because PCA failed to disclose that FBE had a substantial statutory surplus deficit of $51.1 million and PCA P&C was responsible for FBE's liabilities under its reinsurance obligation pursuant to the 1995 Consent Order . Further, PCA's financial statements for the first quarter of 1996 were not in conformity with GAAP because, pursuant to FASB 5, PCA should have recorded a liability for $51.1 million arising from FBE's deficit and should have taken a $51.1 million charge against earnings. In addition, pursuant to FASB 121 (accounting for long term assets), PCA was required to reduce goodwill relating to PCA Solutions' TPA services by $38.9 million and its earnings statement should have shown a $27.3 million loss, net of taxes. In sharp contrast to defendants' positive characterization of PCA's worker's compensation business, PCA P&C viewed FBE's $51.1 million deficit as a serious problem and was working intensively with the DOI at the time of the May 6, 1996 press release to develop a plan to cure FBE's deficit, yet failed to disclose either the deficit or the significant efforts being undertaken to deal with the deficit. Further, the representation that the revenues of PCA

-24-

Solutions had increased was materially misleading because PCA P&C had assumed crippling liabilities of FBE, which were as yet undisclosed, in order to maintain that revenue stream. Defendants did not disclose the material fact that PCA P&C's revenue stream had been maintained at a very high cost.

54.    On May 16, 1996, PCA filed with the SEC its Form 10-Q for the first quarter ending March 31, 1996. In reporting PCA's financial results for the first quarter, the notes to the financial statements represented: "The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 10-Q and Rule 10-01 of Regulation S-X...." "In management's opinion, all adjustments, consisting only of normal recurring adjustments, considered necessary for a fair presentation have been included." This representation was materially false and misleading and the financial statements were not prepared in accordance with GAAP because (1) FBE's statutory deficit of $51.1 million was not disclosed, nor was there a disclosure that there was a potential that reserves were subject to a $51.1 million charge; (2) PCA should have recorded a liability and charge against earnings pursuant to FASB 5; and (3) PCA should have reduced goodwill relating to PCA Solutions' TPA services by $38.9 million and the earnings statement should have shown a $27.3 million loss net, of taxes, pursuant to FASB 121. Defendants also failed to disclose PCA P&C's efforts to obtain additional reinsurance, the failure of which would have a severe negative impact on the financial condition of PCA P&C and PCA.

55.    While PCA did not inform the investing public of the statutory deficits of FBE and FBM, disclosure was made by PCA to potential strategic partner Sierra during confidential negotiations which took place beginning in the Spring of 1996 that PCA P&C was underreserved by approximately $100 million.

> During the Spring of 1996, representatives of Sierra and PCA held discussions regarding the possibility of forming a strategic alliance. Subsequently, representatives of the two entities met at length and shared and exchanged detailed information.
>
> During this information sharing process, PCA and Sierra discussed the levels of reserves recorded in the accounting records of each of PCA's insurance subsidiaries for insurance policy benefits, losses, claims and expenses. With regard to one of its subsidiaries, PCA Property & Casualty Insurance Company ("P&C" or the "Subsidiary") Defendant [PCA] acknowledged that for purposes of applicable Florida insurance regulations, P&C was underreserved by approximately $100 million. [Emphasis added].

See Sierra v. PCA ¶¶6 and 7.

56.     Analysts, based upon guidance from PCA management, reinforced PCA's materially false and misleading press releases by issuing positive reports on the Company. For example, on June 18, 1996, Wasserstein Perella Securities, Inc. initiated coverage on PCA with a "buy" rating, stating:

> The separate business lines operated by Physician Corporation of America are worth significantly more than enterprise value of the company today, which is approximately $640 million.

In its June 18, 1996 report on the Company, Wasserstein Perella Securities, Inc. derived a price per share segment valuation of the worker's compensation full risk segment at $10.71 per share. That analysis was used in part to reach the conclusion that PCA common stock was undervalued, a conclusion that bore no relation to the reality at PCA.

57.     Contemporaneous with these analysts' glowing reports about PCA's prospects, defendants were still desperately trying to obtain approval of the Centre Re reinsurance proposal. In a July 10, 1996 letter to the DOI, Sandy Lazier–Harley, Director of Regulatory Affairs for PCA Solutions, in seeking consideration of the Centre Re reinsurance proposal, acknowledged that PCA

-26-

and its subsidiaries had "determined that Florida Business Mutual and Florida Builders and Employers Mutual have insufficient assets to pay amounts due in accordance with the underlying loss transfer agreements and accordingly, these entities are unable to meet their financial obligations under the [1995] consent order." In her July 10, 1996 letter to the DOI, Ms. Lazier–Harley further noted the material deficits in FBM and FBE:

> In negotiating the 1995 rollover transactions [of FBM and FBE] PCA relied upon the financial statements then available which showed statutory surplus of $35,867,541 for FBM and $8,954,048 for FBE. By contrast the statutory deficit of these entities at December 31, 1995 was ($12,261,841) for FBM [$11,805,970 discounted] and ($78,060,192) for FBE [$51,154,201 discounted]...

However, the defendants knew or recklessly disregarded that PCA P&C was unlikely to obtain DOI approval of the Centre Re financial reinsurance transaction and PCA P&C would be faced with assuming the liability for FBE's and FBM's deficits without the benefit of reinsurance.

58.    Neither the efforts to obtain approval of the Centre Re transaction, nor the likelihood that PCA P&C could not obtain the type of true risk transfer that was likely to be required by the DOI, was disclosed to the investing public. On the same day Ms. Lazier-Harley was imploring the DOI to approve the Centre Re reinsurance proposal, the Chicago Corporation, based upon the false information which it obtained from PCA and in total ignorance of the true state of affairs, issued a report in which a "buy" rating was maintained on PCA (the "Chicago Report"). The July 10, 1996 Chicago Report reiterated PCA's representation that the Company was poised for a turnaround by stating:

> We believe that the Florida HMOs, PCAM in particular, are in the process of emerging from a negative pricing cycle. PCAM has begun pushing up prices on its commercial business in Florida and should begin to see the resulting improvement in its medical loss ratio.

Chicago's estimated 52-week range was $23 to $13 per share.

59.    The Robinson-Humphrey Company, Inc. ("Robinson-Humphrey") also issued a favorable report, dated July 15, 1996, in which PCA was continued at "long-term buy" rating (the "Robinson-Humphrey Report"), oblivious to the deepening financial crisis in the worker compensation segment.  The Robinson-Humphrey Report stated:   "[w]e continue to believe that PCAM represents an attractive long-term investment.  In our view, the upside potential (whether through corrective actions implemented by the company or buyout by another company) outweighs the downside risk."  The 52 week price range for PCA was estimated to be between $23-13 per share.

60.    The deepening financial crisis described above was hidden from the investing public and the analyst community by the defendants.  Consistent with PCA's lack of public disclosure of the extent to which the acquisition of FBM and FBE had gone awry, analysts' reports, issued by companies such as The Chicago Corporation, Market Guide, Inc., The Robinson-Humphrey Company and Wasserstein Perella Securities, Inc., made absolutely no mention of the $51.1 million statutory deficit of FBE or the $11.8 million statutory deficit of FBM, PCA P&C's underreserved status of $100 million, PCA P&C's doomed efforts to obtain reinsurance or the substantial threat to PCA P&C's solvency arising from FBE's and FBM's deficits.  To the contrary, the analysts' reports, based upon information received from PCA, suggested that PCA P&C's entry into the full risk worker's compensation business, if anything, made the acquisition of PCA stock more inviting.

61.    At the time these reports were issued, and at the time analysts were gathering information for these reports from the defendants, the defendants knew or recklessly disregarded that FBE's deficits were calculated at $51.1 million for the year ended December 31, 1995 by late March 1996 and in excess of $60 million by June of 1996.  Moreover, through the summer of 1996, it

-28-

became increasingly apparent to defendants that the DOI would not approve PCA P&C's attempts

to reduce the financial impact of these problems through the Centre Re reinsurance plan. Defendants

kept this information from securities analysts and the investing public and allowed Robinson-

Humphrey Company and Wasserstein Perella Securities, Inc.'s "buy" recommendation and other

positive reports to stand uncorrected, despite the fact that defendants knew such reports were based

upon erroneous and incomplete information provided or approved by them.

62.     In a further effort to obtain approval from the DOI of the Centre Re

reinsurance approach, PCA P&C's executive vice president Bobby Smith wrote a letter on July 25,

1996 to Terry Watson, insurance examiner for the Bureau of Property and Casualty Solvency of the

Florida DOI, stating:

> Earlier this year, the parties to the transactions contemplated by the
> November 14, 1995 consent order concluded that the transactions
> could not be implemented on the terms then anticipated and approved.
> Simply put, actuarial analysis in connection with preparation of the
> December 31, 1995 statutory financial statements of the two mutual
> insurers [FBM and FBE] revealed adverse loss development through
> 1994 requiring substantial increases in reserves and other balance
> sheet adjustments. This caused a dramatic decrease in surplus and
> shortfall on the assets available to transfer in consideration of the
> liabilities to be assumed or reinsured. (Emphasis added)

Thus, Smith admitted to the DOI that the adverse loss development of FBM and FBE occurred as

early as 1994 and remained unabated.

63.     On August 5, 1996, PCA announced results for its second quarter ended June

30, 1996, reporting net income of $5.3 million or $0.14 per share (including a $7.9 million, $0.20

per share gain, from the sale of the Company's Florida medical centers). This press release noted a

sequential improvement of PCA's earnings over the past three quarters. Exclusive of the recognition

of gain/loss from the disposal of assets, PCA's second quarter results purportedly improved to a loss of only $0.06 per share from a $0.27 per share loss in the fourth quarter of 1995 and a $0.13 per share loss in the first quarter of 1996. Five cents of the second quarter loss was attributed to the Georgia and Alabama HMO operations under contract to be sold in the third quarter.

64. Defendant Kardatzke, as quoted in PCA's August 5, 1996 press release, misrepresented PCA's financial condition by representing that PCA's operating results were continuing to improve as follows:

> Our wide-ranging restructuring efforts are beginning to show results. Operating improvements from the sale of underutilized and non-profitable assets, successful hospital recontracting, completing fully capitated arrangements with providers, improved medical management, increasing commercial premium prices, enhanced MIS capabilities and continuing administrative reductions all are proceeding according to plan. We are confident that these ongoing efforts can produce similar operating earnings improvement, achieved in this quarter, over the next several quarters. [Emphasis added].

65. These statements were materially false and misleading, because they ignored the mounting liabilities and statutory surplus shortfall at PCA P&C, due to the assumption of FBE's and FBM's liabilities. FBE's quarterly statement for the quarter ended June 30, 1996 showed that FBE's deficit was greater than $60 million, increasing from FBE's deficit of $51.1 million at December 31, 1995. Pursuant to FASB 5, PCA should have recorded at least an additional $9 million liability and at least a $9 million charge against earnings, over and above the $51.1 million charge it should have recorded in the first quarter. Thus, the financial condition of PCA had not improved in the second quarter of 1996, nor could it be expected to improve in upcoming quarters, particularly since approval of the Centre Re reinsurance proposal appeared increasingly unlikely. PCA falsely implied that the risk to investors associated with PCA's diversification into worker's compensation

-30-

had decreased when, in fact, the undisclosed liabilities of PCA P&C due to the assumption of FBE's

and FBM's liabilities were posing an increasing threat to PCA P&C's ability to continue even to

operate.

      66.     PCA's August 5, 1996 press release also represented that the Company's

exposure to worker's compensation claims risks for business written after January 1, 1996 had been

reduced from 50% to 25% as follows:

> While the Company achieved record health premium revenues in the
> quarter, PCA Solutions, the Company's worker's compensation
> division, entered into new contractual arrangements during the quarter
> with reinsurance carriers <u>to reduce PCA P&C's exposure to claims
> risk from 50% quota share down to 25%, retroactive to January 1,
> 1996</u>. This new arrangement had a one time effect of reducing second
> quarter worker's compensation premiums and claims with minimal
> effect on earnings. [Emphasis added].

However, the press release failed to disclose defendants' efforts to implement the Centre Re

reinsurance proposal, which efforts appeared doomed to failure. Further, this reinsurance referred

to the August 5, 1996 press release related only to business written after January 1, 1996. As such,

defendants knew or recklessly disregarded that the reinsurance would not cover the significant pre-

1995 liabilities of FBE and FBM and the reinsurance did not reduce PCA P&C's exposure to these

liabilities.

      67.     On August 13, 1996, PCA filed with the SEC its Form 10-Q for the quarter

ending June 30, 1996, which was signed by defendants Kardatzke, Donnelly and Grobowsky. The

10-Q set forth PCA's financial results for the second quarter of 1996 which were announced on

August 5, 1996. The Form 10-Q falsely represented that PCA's financial statements were prepared

in accordance with GAAP because PCA did not disclose FBE's and FBM's huge deficits, for which

PCA P&C was responsible, nor did PCA record at least an additional $9 million liability and at least a $9 million charge against earnings, as required by FASB 5. The Form 10-Q also stated with respect to reinsurance:

> In January 1996, the Company, through its workers compensation subsidiaries, began providing primary workers compensation insurance coverage to employer groups in Florida. In conjunction with providing this new product, the Company entered into quota share arrangements with five reinsurers whereby a percentage of the premiums and a percentage of the claims costs are retained by the Company and the remaining percentage is ceded to the reinsurers. In the first quarter of 1996 these agreements included a 50% quota share arrangement; however, in the second quarter, they were amended to a 25% quota share arrangement retroactive to January 1, 1996. The impact to earnings of this retroactive amendment was immaterial. The following illustrates the components of the financial statement captions entitled workers compensation and other revenues and administrative, marketing and other expenses for the quarters ended March 31, 1996 and June 30, 1996.

This statement was materially misleading because it failed to disclose the material facts that (1) the existing reinsurance for FBE was inadequate in view of FBE's huge deficit; (2) PCA P&C needed additional reinsurance and was attempting to obtain DOI approval of the Centre Re reinsurance plan, which approval was highly unlikely because Centre Re was only offering financial reinsurance which was not acceptable to the DOI; and (3) the failure of the Centre Re proposal would have a material adverse impact on PCA P&C with respect to statutory accounting requirements in that PCA P&C would have to report FBE's and FBM's deficits on PCA P&C's balance sheet.

68.    In early September 1996, the DOI refused to approve the Centre Re reinsurance proposal and "[i]n response to the <u>devastating information received regarding the deteriorating financial condition</u> of FBE, PCA P&C retained an actuarial firm [William M. Mercer,

Inc.] to perform a new claims liability evaluation..." as to FBE and FBM. State of Fla. v. PCA P&C at ¶¶ 12, 14.

69. On September 25, 1996, PCA proclaimed in a press release that it was "back into the black" as a result of the closing of the sale of its Georgia and Alabama HMOs to Health Partners of Alabama, Inc. for $24.5 million. Defendant Donnelly stated: "[t]he third quarter 1996 after tax gain expected from this transaction will be approximately $4.5 million. The proceeds of the sale will reduce our bank debt to $118.5 million."

70. Defendants' declaration that PCA was "back into the black" was materially misleading in light of the facts that (a) PCA P&C had assumed FBE's and FBM's liabilities pursuant to the 1995 Consent Order; (b) PCA P&C was concerned about the "devastating information received regarding the deteriorating financial condition of FBE" and had retained an actuarial firm to perform another analysis of FBE's liabilities; (c) PCA should have recorded charges against earnings of at least $60 million; (d) PCA P&C believed that it was underreserved by approximately $100 million; and (e) the Centre Re reinsurance proposal had failed and PCA P&C would have to fund the huge statutory deficits of FBE and FBM without having the needed reinsurance.

71. On October 14, 1996, P&C's Executive Vice-President and Chief Financial Officer David L. Willis hand delivered a letter to Suzanne K. Murphy, Florida Deputy Insurance Commissioner. The letter set forth PCA P&C's final "Plan to Complete the Assumption of Business" of FBM and FBE and a third mutual insurance company Florida Auto Dealers Self-Insurance Fund ("FADA"), without having to report FBM and FBE's accumulated deficits on its financial statements. In this letter, PCA P&C again acknowledged that due to the "significant deterioration of the financial position of FBM and FBE, both of these insurers have insufficient assets to pay amounts due in

-33-

accordance with the underlying agreements." (Emphasis added) In this proposal, PCA P&C agreed to complete its "portfolio rollover" of FBM as provided for in the 1995 Consent Order. With respect to FBE, PCA P&C proposed a new aggregate stop loss insurance policy subject to a reinsurance policy. The letter further noted that the PCA P&C anticipated a "$60 million deficit in FBE which would require further capital infusion by PCA P&C."

72. In early November 1996, after all efforts to obtain approval for the reinsurance proposal had failed, the DOI "demanded that PCA P&C enter into a Consent Order pursuant to which PCA P&C would be placed into administrative supervision in accordance with Florida Statutes §624.82 et seq. (1995)... At the same time, the [DOI] demanded that FBE enter into a consent order for administrative supervision, and FBE was also placed under administrative supervision." State of Fla. v. PCA P&C at ¶15. (Emphasis added) Thereafter, PCA P&C and the DOI entered into a confidential consent order ("1996 Consent Order") placing PCA P&C under administrative supervision pursuant to §624.81 Florida Statutes which administrative supervision was predicated upon the Department's "determination that PCA P&C's projected capital and surplus is not in compliance with Chapter 624, Florida Statutes." In addition, faced with no other options, PCA P&C agreed with the DOI to assume, effective September 30, 1996, statutory financial reporting responsibility for the net liabilities of FBM and FBE, even though PCA P&C had assumed actual financial responsibility for FBM and FBE pursuant to the 1995 Consent Order by assuming their assets and liabilities. Thus, as of September 30, 1996, PCA P&C had full statutory financial reporting responsibility for these two insurers, and, the accumulated deficits of FBM and FBE were required to be reported on PCA P&C's financial statements filed with the DOI for the third quarter ending

September 30, 1996. As a result, PCA P&C could not keep its known liability for the past losses of FBE and FBM off of its balance sheet.

73.     The terms of the 1996 Consent Order prohibited PCA P&C from writing either new or renewal insurance business in the State of Florida without the prior written consent of the DOI. PCA P&C was insolvent on November 1, 1996.

74.     On or about November 2, 1996, the boards of Sierra and PCA unanimously approved a merger agreement in which each share of PCA common stock would be converted into the right to receive .45 share of Sierra common stock. Within two days of the execution of the merger agreement, PCA informed Sierra that the level of PCA P&C's underreserved condition as of September 30, 1996 was estimated to be $130 million, instead of the $100 million previously stated.

75.     It was not until November 4, 1996, when PCA issued its press release announcing third quarter earnings for the quarter ending September 30, 1996, that there was any public revelation that there might be a financial problem with PCA P&C. Yet, even the November 4, 1996 press release and third quarter report on Form 10-Q minimized PCA P&C's problems, failed to reveal the true extent of the problems and continued to materially mislead the investing public. In the November 4, 1996, press release, PCA stated that its third quarter earnings showed improved HMO results before a "one-time" after-tax charge of $100 million ($2.55 per share) against the worker's compensation business. While PCA acknowledged that the charge related to a November 1, 1996 agreement whereby, effective September 30, 1996, PCA recorded on its balance sheet its financial responsibility for the accumulated deficits of FBM and FBE, PCA failed to disclose that this agreement had rendered PCA P&C insolvent and that PCA P&C could not write any new business without prior written DOI approval. While acknowledging that the "statutory equity" of PCA P&C

had been substantially depleted," PCA stated misleadingly that it had "agreed that the DOI may exercise certain oversight functions with respect to PCA P&C's operations until such time as PCA P&C's statutory equity surplus has been restored." (Emphasis added) PCA P&C's own counsel, in responding to an Order to Show Cause issued by the DOI, later characterized the notion that this "deficit" could be cured between November 1996 and February 1997 as "ludicrous." State of Fla. v. PCA P&C, at ¶ 18. The Company also falsely stated in its quarterly report that this "non-recurring charge" would be absorbed by the existing $100 million in statutory surplus of PCA P&C and that "no additional funding is anticipated," when in fact this charge completely depleted PCA P&C's surplus. Moreover, defendants knew, many months before the November 4, 1996 announcement, that PCA P&C was underreserved by approximately $100 million, as PCA had told Sierra. As such, defendants knew at the time of the November 4, 1996 press release that PCA P&C was insolvent, that it had no statutory surplus and that substantial additional funding would certainly be required to cure PCA P&C's statutory deficit, although such funding was highly improbable or "ludicrous" under the circumstances.

76. Further, PCA misleadingly stated in the November 4, 1996 press release that it assumed financial responsibility for the deficits of FBM and FBE as of September 30, 1996, pursuant to the 1996 Consent Order, when in fact, it assumed the assets and liabilities of those funds pursuant to the 1995 Consent Order. The 1996 Consent Order merely required PCA to assume statutory financial reporting responsibility for the liabilities of FBE and FBM, which liabilities PCA P&C had actually assumed one year earlier.

77. With respect to the deficits of FBE and FBM, the November 4, 1996 press release misleadingly stated: "The accumulated deficits were recently quantified by a national actuarial

firm." The release did not disclose the material fact that defendants knew seven months earlier in late March of 1996 that FBE had a deficit of $51.1 million, at December 31, 1995 and $60 million by June 1996, and, at least by July 1996, that FBM had a deficit of $11.8 million.

78.     In order to blunt the impact of the $100 million charge arising out of the 1996 Consent Order, the charge was announced in conjunction with an announcement that PCA had signed a definitive agreement to merge into Sierra.  PCA stated that the merger was expected to close by March 31, 1997, pending normal shareholder and regulatory approval.

79.     The proposed Sierra merger was used by the defendants to hide the deepening financial crisis at PCA. Defendants expected to bury PCA's problems with its worker's compensation business by entering into the merger with Sierra.  In disclosing the Sierra merger, PCA stated that it would generate more than $2 billion in annual revenues and serve nearly 1.5 million people in 17 states and Puerto Rico, resulting in PCA becoming the nation's eighth largest publicly-traded managed care company. However, in view of PCA's financial condition as a result of the insolvency of PCA P&C, defendants knew or recklessly disregarded the fact that it was unlikely that the merger would ever be consummated.

80.     PCA's November 4, 1996 press release further misrepresented the Company's financial position by:

(a)     failing to disclose the full extent of PCA P&C's unfunded liabilities;

(b)     falsely indicating that PCA's financial condition had materially improved to breakeven earnings over the previous quarter's loss of $0.06 per share;

(c)     misrepresenting PCA's attractiveness as a merger candidate;

(d)     failing to state that PCA was in danger of defaulting on over $100 million in bank debt;

(e)     failing to indicate that PCA's ability to continue as a going concern was in jeopardy; and

(f)     failing to disclose that the goodwill value of PCA Solutions had declined so substantially that a large goodwill write down, which totaled approximately $39 million, would be necessary.

81.     Notwithstanding the foregoing, defendants issued the materially false and misleading statements in the November 4, 1996 press release in order to support and advance the merger between PCA and Sierra. Indeed, the Individual Defendants, collectively, owned millions of shares of PCA common stock and would have earned a substantial premium if the merger went forward. As of January 1, 1996: (1) defendant Kardatzke owned 3,146,533 shares of PCA stock or 8.1% of the outstanding common stock; (2) defendant Kilissanly owned 850,398 shares or 2.2%; and defendant Donnelly owned 266,800 shares. In addition, PCA's merger agreement with Sierra expressly stated that senior management would retain their positions for a period of five years after the merger. Under the terms of the agreement, defendant Kardatzke would not only be Chairman of the Board of Directors of the new entity, but would also play a major role in its Florida operations. Defendant Kilissanly was also guaranteed a senior position in Sierra's proposed southeastern region (which was to include Florida) as either President or as an officer and director.

82.     On November 14, 1996, PCA filed with the SEC its Form 10-Q for its third quarter ended September 30, 1996, which was signed by defendants Kardatzke, Donnelly and

Grobowsky. PCA's third quarter 10-Q once again falsely stated that the $100 million charge attributed to net worker's compensation liabilities was "non-recurring":

> A preliminary actuarial evaluation indicates that FBE's liabilities exceed its assets by approximately $130.0 million on a pre-tax undiscounted basis as of September 30, 1996. Accordingly, PCA has recorded a **non-recurring** loss on assumption of net worker's compensation liabilities of $100.0 million (net of a $30.0 million income tax benefit) in the third quarter of 1996, as it has determined the future recoverability of this deficit cannot be assured. All assets and liabilities of the FBE and FBM Funds have been consolidated with the results of the Company in the accompanying balance sheet as of September 30, 1996. Accordingly, the Company has reported additional assets of $260.0 million (most of which are long-term investment grade securities) and additional liabilities of $360.0 million (most of which are long-term worker's compensation claims) on its balance sheet as of September 30, 1996. (Emphasis added.)

> 83.     The Form 10-Q continued:

> As a result of this $100.0 million charge, the statutory equity of P&C has been substantially depleted. Accordingly, the Company has agreed that the DOI may exercise certain oversight functions with respect to P&C's operations until such time as P&C's statutory equity surplus has been restored. (Emphasis added.)

In stating that the DOI "may exercise certain oversight functions," defendants again failed to disclose the material facts that (1) the DOI demanded that PCA P&C and FBE be placed under administrative supervision; (2) that PCA P&C was prohibited from writing any business without prior written approval of the DOI, which approval it was unlikely to receive; and (3) it was "ludicrous" to believe that PCA P&C's statutory surplus could be restored at any time in the near future.

> 84.     The Form 10-Q further misrepresented the 1996 Consent Order and the

circumstances surrounding PCA P&C's assumption of the liabilities of FBE and FBM:

> On November 1, 1996, the Company entered into various arrange-
> ments, all of which are pending approval from the Florida Department

of Insurance (DOI), to assume, effective September 30, 1996, financial responsibility for the net liabilities of the Funds as part of its evaluation of its entire workers compensation operations in Florida and determined it was necessary to preserve its TPA service revenue and further that it was in the best interest of the Company and the Funds policy-holders to do so.

This statement falsely represented that PCA P&C assumed financial responsibility for FBE and FBM in November 1996, when in fact it assumed such responsibility one year earlier pursuant to the 1995 Consent Order. PCA made it appear that PCA P&C's assumption of the liability of FBE and FBM was voluntary and was motivated by defendants' desire to serve the best interests of the policyholders when in fact, the assumption of statutory financial reporting responsibility of FBE and FBM was required by the DOI pursuant to the 1996 Consent Order.

85. PCA's representations deceptively omitted to inform investors that PCA P&C had fallen substantially below the statutory minimum surplus requirement imposed by the State of Florida and was insolvent and that the DOI had demanded that PCA P&C as well as FBE be placed under administrative supervision. The statements were also materially misleading because the defendants failed to disclose fully the potential consequences of PCA P&C's surplus deficit (including, but not limited to, loss of PCA P&C's certificate of authority to operate, and/or full assumption of PCA P&C operations by the DOI).

86. Finally, PCA's third quarter 10-Q falsely represented that the Company would incur no further liabilities associated with underwriting worker's compensation insurance. PCA's third quarter 10-Q stated that:

In response to its evaluation of the long-term prospects of the Florida workers compensation insurance risk, the Company intends to cease writing all worker's compensation insurance products and to focus its worker's compensation division on providing TPA services to its

current and future customer base. The Company believes that this will eliminate the Company's exposure to worker's compensation under-writing risks. [Emphasis added].

These statements were materially false and misleading because (1) since PCA's exposure to worker's compensation underwriting risks was from the past writings (pre-1995) of FBE and FBM, not the current (post-1995) worker's compensation business written by PCA P&C, the cessation of writing worker's compensation insurance products would have no impact on PCA P&C's huge pre- 1995 liabilities; and (2) the Company did not decide to cease writing all worker's compensation products voluntarily, but was required to do so by the DOI pursuant to the 1996 Consent Order.

87.     On November 15, 1996, in sworn statutory financial statements filed with DOI for the third quarter ended September 30, 1996, PCA P&C admitted to a deficit of over $48.3 million, including a deficit of $105.7 million attributable to FBE. See State of Fla. v. PCA P&C at ¶ 18. PCA's complaint against Sierra seeking specific performance of their merger agreement similarly admits that "[i]n November of 1996, an actuarial analysis revealed that P&C had a statutory deficit as a result of reinsuring or assuming the historical losses and liabilities of these entities." See PCA v. Sierra, ¶ 17. (Emphasis added.)

88.     On or around mid-February 1997, defendants received preliminary reports from the actuarial firm of William Mercer that the deficit of PCA P&C would be substantially greater than the $48.3 million previously reported and that the deficit was almost entirely attributable to the liability of PCA P&C on the $156.8 million deficit of FBE. See State of Fla. v. PCA P&C at ¶ 20.

89.     From March 31, 1996 until February 20, 1997, while PCA P&C's financial situation continued to decline at an alarming pace, there was no public announcement, through news release or through market analysts or indication in any reports filed with the SEC, of how critical

PCA's financial condition had become. The situation was, however, well known to the defendants. As a result of defendants' failure to disclose these material facts, PCA common stock traded at artificially inflated levels as high as $14.75 per share during the Class Period.

90.     On February 20, 1997, PCA announced that, contrary to the representation in the third quarter 10-Q, it would take an additional $60 million charge in the fourth quarter of fiscal year 1996 to cover increased liabilities associated with the worker's compensation division, including the liabilities of FBM and FBE, thereby making PCA P&C underreserved by $190 million. Sierra, realizing that it was in fact "ludicrous" to think that PCA P&C would return to solvency any time soon, announced on February 20, 1997 that it was "seriously evaluating" its options after the report of PCA's $60 million charge against earnings for the fourth quarter. Later that same day, PCA admitted that the charge would be "approximately $80 million," not the $60 million figure previously announced, thereby making PCA P&C underreserved by $210 million. PCA stated that the impact of the charge on the proposed merger with Sierra could not be determined. PCA also acknowledged that the charge would put it in default on its $102 million bank debt and that PCA was in discussions with its bankers on that issue.

91.     In response to these announcements, PCA stock plunged 44%, dropping $4.0625 to $5.0625 on a volume of 3.7 million shares, more than 18 times the Company's average daily volume for the prior three months.

92.     On February 24, 1997, the Company announced that fourth quarter operations, excluding the results of the worker's compensation subsidiary, were expected to earn between $3.0 and $4.0 million before taxes. The Company stated that it was pleased with the progress being made in its core operations and was both "surprised and disappointed" with the additional estimated losses

incurred by the worker's compensation subsidiaries. There was no elaboration of why PCA management was surprised regarding losses in the worker's compensation subsidiary, nor could there have been because they had known or recklessly disregarded that FBE was in serious financial trouble at least since late March 1996 and FBM since at least July 1996. The Company also announced that its lenders granted a waiver of the covenant of default on the Company's loan, which default had been caused by the losses sustained by the worker's compensation subsidiaries.

93.    On February 25, 1997, the Florida State Treasurer and Insurance Commissioner Bill Nelson announced that he had obtained a court order requiring PCA P&C to show cause why it should not be taken into rehabilitation by the DOI. Again, defendant Kardatzke feigned surprise by this turn of events:

> Prior to the W/C Sub [the worker's compensation subsidiary] agreeing to assume the liabilities of four Florida self-insured worker's compensation funds, PCA and its consultants reviewed actuarial opinions, received in 1995, showing that all these funds, in the aggregate, were solvent. We are shocked by the radical change in the financial status of these funds. We are evaluating our legal options for the apparent discrepancies between the 1995 and 1996 actuarial reports. (Emphasis added.)

Since defendants had known or recklessly disregarded since late March 1996 of the serious statutory deficit of FBE and, at least since July, 1996 of FBM's deficit, there was in fact no "radical change in the financial status of these funds" and no cause for "shock" by defendant Kardatzke.

94.    At the same time, PCA also announced that it projected between $225 and $250 million in worker's compensation losses for 1996, nearly double the estimates that had been previously disclosed. In response to this news, the price of PCA stock lost an additional 49% of its value, dropping $1.625 per share to close at $3-13/16 per share on February 26, 1997. Eric Handler,

-43-

an analyst at J. W. Charles, commented: "Lots of people are in the dark about this company. It's not a good situation."

95.     On March 1, 1997, members of Sierra senior management met with the PCA Board of Directors and informed the Board that Sierra would not proceed with the merger as set out in the merger agreement. Instead, Sierra was only interested in purchasing PCA's Texas operations. See PCA v. Sierra, ¶30. Defendants did not disclose this material event to the investing public.

96.     On March 18, 1997, Sierra announced that it had terminated its agreement to acquire PCA in a stock swap valued at $509 million. In response to this news, the price of PCA common stock dropped $0.44 or 9% of its value, closing at $4.25 per share. At the same time, it was reported that PCA filed a lawsuit against Sierra for terminating the merger agreement. In response, Sierra (and its subsidiary Sierra Acquisition, Inc.) filed a lawsuit against PCA in the Delaware Court of Chancery. In its complaint, Sierra alleged, among other things, that PCA made "substantial misrepresentations" regarding its financial condition and, in particular, misrepresented the amount by which PCA was underreserved in its worker's compensation subsidiary.

97.     On March 31, 1997, PCA announced that for the year ended December 31, 1996, it expected to report a net loss of $277.7 million, or $7.16 per share, compared to a net loss for year ended December 31, 1995 of $24.6 million, or $0.62 per share. PCA also reported that the net loss for the fourth quarter ending December 31, 1996 was $182.6 million or $4.70 per share, compared to a net loss in the fourth quarter of 1995 of $36.5 million or $0.92 per share. PCA admitted in the press release that "[c]harges and losses in the Company's worker's compensation segments had a major negative impact on the Company's overall 1996 performance." Of the total pre-tax loss for 1996 of $313.0 million, $284.4 million was attributable to the PCA's worker's

compensation related losses, including a $38.9 million impairment of long-lived assets for the write-down of goodwill associated with the Company's TPA services.  On April 1, 1997, PCA common stock closed at $4-5/8 per share.

98.    The market for PCA's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose the full truth about PCA and its business and future prospects, PCA common stock traded at artificially inflated prices during the entire Class Period, until the time the adverse information described above was finally provided to and digested by the securities markets.  Plaintiffs and other members of the Class purchased or otherwise acquired PCA common stock relying upon the integrity of the market price of PCA stock and market information relating to PCA, or in the alternative, upon defendants' materially false and misleading statements, and in ignorance of the adverse, undisclosed information and false financial statements known to or recklessly disregarded by defendants, and have been damaged thereby.  Had Plaintiffs and other members of the Class known of the materially adverse information not disclosed by the defendants, they would not have purchased or acquired PCA common stock at the artificially inflated prices they did or at all.

### Scienter Allegations

99.    At all relevant times, defendants had actual knowledge that the statements complained of herein were materially false and misleading and intended to deceive plaintiffs and the other members of the Class.  In the alternative, defendants acted in reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts and would have revealed the materially false and misleading nature of the statements complained of herein, although such facts were readily available to defendants.  Information showing that the defendants acted knowingly or

with reckless disregard for the truth is peculiarly within defendants' knowledge and control. However, the following facts, among others, support a strong inference that defendants acted with scienter with respect to each of the misrepresentations and/or omissions alleged:

(a)    Defendants knew or recklessly disregarded in November of 1995 that PCA's capital commitment of $60 million to PCA P&C to cover future business written by FBE and FBM would be insufficient to cover all claims on business written by FBE in the past, in view of FBE's limited amount of surplus;

(b)    Defendants knew or recklessly disregarded that PCA P&C had assumed the liabilities of FBE and FBM pursuant to the 1995 Consent Order, yet failed to disclose this fact and misled investors into believing that they did not assume such liabilities until November 1, 1996;

(c)    Defendants knew or recklessly disregarded, at least as early as March 31, 1996, that FBE had a deficit of $51.1 million, and, as a result, the capital of PCA P&C would be depleted or seriously diminished, thereby rendering PCA P&C subject to various regulatory actions;

(d)    Defendants knew or recklessly disregarded GAAP, which required PCA to disclose FBE's $51.1 million deficit, for which PCA P&C was financially responsible and to record a charge against earnings;

(e)    Defendants knew or recklessly disregarded that PCA's financial statements for the fiscal year ending December 31, 1995 and the quarters ending March 30, 1996 and June 30, 1996 were not prepared in accordance with GAAP because FASB 5 required PCA to record a liability of $51.1 million and take a charge against earnings of $51.1 million by the end of March 1996 and at least an additional $9 million liability and charge against earnings by the end of June 1996 and FASB 121 required a reduction in goodwill for PCA Solutions' TPA services by $38.9 million;

-46-

(f)    Defendants knew or recklessly disregarded by the spring of 1996 that PCA P&C was underreserved by approximately $100 million;

(g)    Defendants knew or recklessly disregarded by July 1996 that it was becoming increasingly apparent that the Centre Re reinsurance alternative would not be approved by the DOI and that PCA P&C's capital and surplus would be virtually eliminated in order to cover the deficit in FBE, depleting all of the capital that had been placed into PCA P&C by PCA for the purpose of writing future business, leaving PCA P&C with insufficient capital to continue operations;

(h)    Defendants knew or recklessly disregarded that they were unlikely to obtain the DOI's approval of the Centre Re reinsurance proposal and would therefore not be able to continue to keep the statutory deficits of FBE and FBM off PCA P&C's balance sheet;

(i)    Defendants knew or recklessly disregarded on November 1, 1996 that PCA P&C was insolvent with no immediate hope of returning to solvency, that the DOI had prohibited PCA P&C from writing any worker's compensation insurance without prior written DOI approval and that the DOI had demanded that PCA P&C and FBE be placed under administrative supervision;

(j)    Defendants knew or recklessly disregarded at the time of receipt of the Mercer Report in mid-February 1997 that PCA would have to take an additional, substantial charge after the $100 million charge it took as of the end of the third quarter, due to the hemorrhaging losses in FBE. Defendants knew or recklessly disregarded the fact that the $100 million charge was not a "one-time" or "non-recurring" charge due to the known problems PCA P&C was encountering in its worker's compensation business, particularly FBE;

(k)     Defendants knew or recklessly disregarded that there was no hope of curing PCA P&C's huge deficit and that vast amounts of additional funding would be needed but would not be forthcoming;

(l)     Defendants knew or recklessly disregarded that the insolvency and continuing losses in PCA P&C would have a severe, adverse impact on PCA's financial condition and future prospects; and

(m)     Defendants knew or recklessly disregarded that disclosure of these massive worker's compensation related losses would seriously jeopardize the acquisition of PCA by Sierra and there was no reasonable likelihood that the merger would ever be consummated.

(n)     The Individual Defendants knew that the value of their large personal holdings of PCA stock would be jeopardized if the truth were disclosed and, after entering into the merger agreement with Sierra, the Individual Defendants knew that the merger would not occur if Sierra learned the full truth. Both defendants Kardatzke and Kilissanly would have maintained their lucrative managerial positions if the Sierra merger had occurred and, therefore, had a strong incentive to conceal the full magnitude of PCA's problems as long as possible.

100.     These misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of PCA, its profitability and its business prospects, thus causing PCA's common shares to be overvalued and artificially inflated at all relevant times. Defendants' false portrayal of PCA, the extent of the hemorrhaging losses in FBM and FBE and the effect on PCA P&C's profitability and operations and PCA's prospects during the Class Period, and the failure to disclose the extent to which the Sierra merger was at risk, resulted in Plaintiffs and other

-48-

members of the Class purchasing PCA's common shares at a disparity between their market price and their actual value, thus causing the damages complained of herein.

## PCA'S GUIDANCE TO SECURITIES ANALYSTS
## AND USE OF THEM AS A CONDUIT TO PROVIDE
## FALSE INFORMATION TO THE SECURITIES MARKETS

101.    Defendants used communications with securities analysts to promote PCA and to inflate artificially the price of PCA common stock during the Class Period.

102.    At all relevant times, PCA was followed by securities analysts employed by brokerage houses which issued reports and made recommendations concerning PCA's common stock to their clients. Several securities firms followed the Company during the Class Period, including The Chicago Corporation, Market Guide, Inc., the Robinson-Humphrey Company and Wasserstein, Perella Securities, Inc.

103.    In writing their reports, these analysts relied in substantial part upon information provided by the Company, public statements and reports of the Company, information provided to them privately by defendants and assurances by the Individual Defendants and the Company that information in the analysts' reports did not materially vary from the Company's internal knowledge of its operations and prospects.

104.    Prior to, and during the Class Period, it was the Company's practice to have its top officers and key members of its management team communicate regularly with securities analysts at the firms identified above (and others), on a regular basis to discuss, among other things, the Company's operating results and anticipated revenues and to provide detailed "guidance" to these analysts with respect to the Company's business and anticipated revenues and earnings. These communications included, but were not limited to, conference calls, meetings, and analyst briefings

where the defendants discussed relevant aspects of the Company's operations and financial prospects. Additionally, as described below, PCA representatives -- including certain of the Individual Defendants -- also attended "conferences" sponsored by different organizations throughout the Class Period and sponsored "conference calls" with securities analysts and institutional investors in connection with releases of earnings announcements and other major corporate events during which they promoted the Company's stock by disseminating materially misleading information about the Company.

105.    The defendants knew that by participating in these regular and periodic direct communications with analysts, the Company could disseminate information to the investment community and that investors and the market would rely and act upon such information (i.e., make purchases of PCA's common stock).  The Individual Defendants had these communications with analysts in order to cause or encourage them to issue favorable reports concerning PCA -- which the analysts did -- and defendants used these communications falsely to present the operations and allegedly successful prospects of PCA to the marketplace in order to inflate artificially the market price of PCA's common stock.  Despite their duty to do so, the Individual Defendants failed to correct these statements (of which they were the sources or which they had caused or facilitated) prior to the close of the Class Period.

106.    The investment community and, in turn, investors, relied and acted upon the information communicated in these written reports that repeatedly recommended that investors purchase PCA common stock.  Defendants manipulated and inflated the market price of PCA stock by falsely presenting to analysts, through regular meetings and during both telephonic and written

communications, the financial condition, earnings and prospects of the Company and by failing to disclose the true adverse information about the Company that was known only to them.

## NO SAFE HARBOR

107. The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward looking" when made, there was no statement made with respect to any of those representations forming the basis of this complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of PCA who knew that those statements were false when made.

## RELIANCE ALLEGATIONS
## FRAUD-ON-THE-MARKET DOCTRINE

108. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

        (a)     PCA common stock met the requirements for listing, and was listed on NASDAQ, a highly efficient market;

        (b)     as a regulated issuer, the Company filed periodic public reports with the SEC;

        (c)     the trading volume of the Company's stock was substantial, reflecting numerous trades each day;

        (d)     PCA was followed by securities analysts employed by several major brokerage firms who wrote reports which were distributed to the sales force and certain customers of such firms and which were available to various automated data retrieval services;

        (e)     the misrepresentations and omissions alleged herein were material and would tend to induce a reasonable investor to misjudge the value of PCA common stock; and

        (f)     plaintiffs and the members of the Class purchased their common stock during the Class Period without knowledge of the omitted or misrepresented facts.

109.    Based upon the foregoing, plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for the purpose of class certification as well as for ultimate proof of their claims on the merits. Plaintiffs will also rely, in part, upon the presumption of reliance established by material omissions and upon the actual reliance of the class members.

## COUNT I

### SECTION 10(b) OF THE EXCHANGE ACT AND
### RULE 10b-5 OF THE SECURITIES AND EXCHANGE COMMISSION

110.    Plaintiffs incorporate by reference and reallege each paragraph above as though fully set forth herein.

111.    During the Class Period, the Defendants, singly and in concert, engaged in a plan, scheme and unlawful course of conduct, pursuant to which they knowingly and recklessly engaged in acts, transactions, practices, and courses of business, all of which operated as a fraud and deceit upon Plaintiffs and other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and other class members. The purpose and effect of said scheme was to induce Plaintiffs and the Class to purchase PCA common stock during the Class Period at artificially inflated prices and to inflate the value of the stock which was held directly or indirectly by Defendants.

112.    During the Class Period, Defendants, pursuant to said plan, scheme and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the preparation and issuance of deceptive and materially false and misleading statements to the investing public, which were contained in or omitted from various documents, the 1995 Form 10-K, quarterly reports on Form 10-Q, and various other statements and releases, as particularized above.

113.    In particular, the statements in and omissions from the public filings and the other statements made during the Class Period were materially false and misleading for the reasons set forth above.

-53-

114.     Each of the Defendants knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the integrity of the market in PCA common stock and/or artificially inflate or maintain the price of such stock. The Company's common stock is traded on an active and efficient market and is followed by numerous stock market analysts. Had the adverse facts Defendants concealed been disclosed, PCA stock would not have sold at the artificially inflated prices it did during the Class Period.

115.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes and artifices to defraud, (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and other members of the Class in connection with the purchase of PCA stock during the Class Period.

116.     As a result of the foregoing, the market price of PCA common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the representations described above, Plaintiffs and other members of the Class relied to their detriment on the integrity of the market as to the price of these securities.  Alternatively, Plaintiffs and other members of the Class relied on the material misstatements and omissions of the Defendants.

117.     The price of PCA common stock declined materially upon the public disclosures of the true facts which had been misrepresented or concealed as alleged in this Complaint. Plaintiffs and other members of the Class have suffered substantial damages as a result of the wrongs herein alleged.

## COUNT II

## SECTION 20(a) OF THE EXCHANGE ACT

118.    Plaintiffs incorporate by reference and reallege each paragraph above as though fully set forth herein.

119.    Each of the Individual Defendants was a controlling person of PCA within the meaning of § 20(a) of the Exchange Act, by virtue of their positions as officers and/or directors of PCA and their direct or indirect ownership of voting shares of PCA.

120.    By virtue of their positions as controlling persons of PCA, each of these Individual Defendants is jointly and severally liable under § 20(a) of the Exchange Act to the Plaintiffs for damages suffered as a result of the acts and omissions set forth above.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment, as follows:

A.    Declaring this action to be a proper class action and certifying the plaintiffs as class representatives and plaintiffs' counsel as class counsel;

B.    Awarding Plaintiffs and all members of the Class damages in an amount which may be proven at trial, together with interest thereon;

C.    Awarding Plaintiffs and the Class their costs and expenses incurred in this action, including reasonable attorneys', accountants' and experts' fees; and

D.    Such other and further relief as may be just and proper.


Dated: June 1, 1998                          BURT & PUCILLO, LLP,


                              By:
                                   _____
                                   Michael J. Pucillo (Florida Bar No. 261033)
                                   R. Scott Palmer (Florida Bar No. 0220353)
                                   Esperanté' Building, Suite 300 East
                                   222 Lakeview Avenue
                                   West Palm Beach, FL  33401
                                   (561) 835-9400

                                   **WAMPLER, BUCHANAN & BREEN, P.A.**
                                   Atlee W. Wampler, III (Florida Bar No. 311227)
                                   900 Sun Bank Building
                                   777 Brickell Avenue
                                   Miami, FL 33131
                                   (305) 577-0044

                                   **Co-Liaison Counsel for Plaintiffs**

                                   **STULL, STULL & BRODY**
                                   Jules Brody
                                   Six East 45th Street
                                   New York, NY 10017
                                   (212) 687-7230

                                   **COHEN, MILSTEIN, HAUSFELD
                                     & TOLL, P.L.L.C.**
                                   Steven J. Toll
                                   1301 5th Avenue, Suite 2905
                                   Seattle, WA  98101
                                   (206) 521-0080


                                      -56-

**COHEN, MILSTEIN, HAUSFELD
 & TOLL, P.L.L.C.**
Daniel S. Sommers
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005-3934
(202) 408-4600

**Co-Lead Counsel for Plaintiffs**


**SAVETT FRUTKIN PODELL & RYAN, P.C.**
Stuart H. Savett
Barbara A. Podell
325 Chestnut Street, Suite 700
Philadelphia, PA 19106
(215) 923-5400

**WEISS & YOURMAN**
Joseph H. Weiss
Joseph Cohen
551 Fifth Avenue, Suite 1600
New York, NY 10176
(212) 682-3025

**Executive Committee of Plaintiffs' Counsel**


**JAMES M. ORMAN**
1735 Market Street, Suite 3000
Philadelphia, PA 19103-7594
(215) 575-7630

**ROBERT C. GILBERT, P.A.**
Robert C. Gilbert
133 Sevilla
Coral Gables, FL
(305) 529-9100

**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing has been furnished via

U.S. Mail to all counsel on the attached Service List this 1st day of June, 1998.

MICHAEL J. PUCILLO

55092\Complaint.con

-58-

Michael J. Pucillo, Esq.
BURT & PUCILLO, LLP
222 Lakeview Avenue
Suite 300 East
West Palm Beach, FL  33401

Robert C. Gilbert, Esq.
ROBERT C. GILBERT, P.A.
133 Sevilla
Coral Gables, FL  33134

Steven J. Toll, Esq.
COHEN MILSTEIN HAUSFELD
  & TOLL, P.L.L.C.
The First Interstate Building
999 Third Avenue, Suite 3600
Seattle, Washington 98104-4001

Daniel S. Sommers, Esq.
COHEN, MILSTEIN, HAUSFELD,
  & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C.  20005-3934

Alexander Sussman, Esq.
John Dellaportas, Esq.
FRIED, FRANK, HARRIS, SHRIVER
 & JACOBSON
One New York Plaza
New York, NY 10004-1980

Andrew S. Berman, Esq.
YOUNG, BERMAN & KARPF, P.A.
17071 West Dixie Highway
North Miami Beach, FL 33160

Jules Brody, Esq.
STULL, STULL & BRODY
6 East 45th Street
New York, NY  10017

Joseph H. Weiss, Esq.
WEISS AND YOURMAN
551 5th Avenue, Suite 1600
New York, NY  10176

Stuart H. Savett, Esq.
Barbara Podell, Esq.
SAVETT FRUTKIN PODELL & RYAN, P.C.
325 Chestnut Street, Suite 700
Philadelphia, PA  19106

Atlee W. Wampler, III, Esq.
WAMPLER, BUCHANAN & BREEN, P.A.
900 Sun Bank Building
777 Brickell Avenue
Miami, FL   33131

James M. Orman, Esq.
THE LAW OFFICES OF JAMES M. ORMAN
1735 Market Street
Suite 3000
Philadelphia, PA 19103